IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

        v.

DANTE FOSTER,

      Defendant.

     \*

     \*

     \*

     \*     Criminal No.: WDQ-12-0319

     \*

     \*

     \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Dante Foster[1] is charged with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1).  Pending are Foster's motions to suppress custodial statements, tangible and derivative evidence from his arrest, and tangible evidence seized "as a result of" a search of 14 Laurel Path Court, Nottingham, Maryland ("14 Laurel Path").  ECF Nos. 13, 14, 24.  An evidentiary hearing was held on Monday, November 26, 2012.  For the following reasons, Foster's motions to suppress were denied.[2]

---

[1] Also known as "Donte Foster."

[2] The Court also denied Foster's *pro se* omnibus defense motion. ECF No. 25.

I.  Background[3]

On December 14, 2011, Baltimore Police Department ("BPD")
and Drug Enforcement Administration ("DEA") investigators
conducted pre-raid surveillance at 5313 Holder Avenue,
Baltimore, Maryland ("5313 Holder").  Aff. in Supp. of Crim.
Compl., ECF No. 1 at 2; Hr'g.  The investigators had obtained a
state search warrant for the address.  ECF No. 1 at 2; Hr'g.  A
confidential informant stated that Foster's brother, Octavius
Strong, lived there and sold narcotics with Foster.  ECF No. 1
at 2; Hr'g.

At about 4:20 p.m., Foster left the residence in a blue
Chrysler Pacifica, which was registered in his name.  ECF No. 1
at 2; Hr'g.  BPD Detectives Mahan and Brown followed the car for
about two miles.  ECF No. 1 at 2; Hr'g.[4]  Mahan testified that he
observed the Chrysler repeatedly switch lanes in an unsafe
manner and without using a turn signal, in the span of about
four minutes.  Hr'g.[5]  After Mahan received radio instructions to
initiate a traffic stop of Foster's car--and advised that he had
observed a traffic infraction--Brown turned on his lights and

---

[3] The facts are taken from the affidavit in support of the
criminal complaint, ECF No. 1 at 2-3, and this Court's
recollection of the November 26, 2012 evidentiary hearing
("Hr'g").

[4] Other officers followed Foster's Chrysler; Detectives Mahan and
Brown were in the lead.  Hr'g.

[5] Foster denied having changed lanes.  Hr'g.

sirens.  *Id.*  Mahan stopped in front of Foster's Chrysler, which

was in the left lane in the 8100 block of Belair Road in

Baltimore County, Maryland.  *Id.*[6]  Brown approached the driver's

side of the car; Mahan approached the passenger's side.  *Id.*

While standing at the passenger's side window, Mahan testified

that he observed a small plastic bag containing suspected

marijuana in the center console's cup holder.  *Id.*[7]  BPD and DEA

Task Force Officer Craig Jester has attested that the other

officer--presumably, Brown--could "smell the odor of marijuana

coming from the vehicle."  ECF No. 1 at 2.

Brown asked Foster to get out of the Chrysler, and arrested

him.  Hr'g.  Mahan then orally gave Foster *Miranda* warnings;

Mahan testified that Foster indicated he understood his rights.

*Id.*[8]  Brown found currency and a digital scale on Foster.  *Id.*

Mahan searched the Chrysler and found suspected marijuana and

---

[6] Mahan testified that he could not have pulled Foster over
earlier, in Baltimore City, because there was rush hour traffic,
and he did not want to alert Foster to the police's presence.
Hr'g.

[7] Mahan did not remember whether the windows were up or down, but
testified that they were not tinted.  Hr'g.  Foster and his
girlfriend, Wanda Gainey, testified that the windows were
tinted.  *Id.*

[8] Foster denied having acknowledged his rights.  Hr'g.

cocaine beneath cup holders near the rear of the car. *Id.*[9] Upon entering the car, Mahan also smelled unburned marijuana. *Id.* DEA Special Agent Bernard Malone arrived and spoke with Foster in an unmarked police car. *Id.* Malone obtained identifying information about Foster, including his name and date of birth. *Id.*

Before the car search could be completed, the detectives were called back to 5313 Holder to assist in the execution of the search warrant. ECF No. 1 at 2-3; Hr'g. Foster's car was towed to the BPD's Northeast District lot. ECF No. 1 at 3. Sometime after the warrant was executed, Jester returned to the Chrysler to finish the search. *Id.* Using a pocketknife, Jester lifted the passenger's side back seat cup holder and found a Smith & Wesson 9mm semi-automatic handgun. *Id.* at 3; Hr'g. Jester also seized the key from the ignition, the key ring, and attached keys. Hr'g.

Malone, Jester, and Special Agent Andrew Biniek met with Foster at the Northeast District sometime between 4:30 and 7:00 p.m. Hr'g. Malone testified that he administered oral *Miranda* warnings, and Foster indicated he understood his rights and

---

[9] A field test was positive for both substances. ECF No. 1 at 2. Foster testified that there was no marijuana, cocaine, firearm, or ammunition in the Chrysler. Hr'g.

wanted to cooperate. Hr'g.[10]   According to Jester, Foster stated
that he had recently been staying with his girlfriend, Wanda
Gainey, in White Marsh. Id.[11]

After Malone interviewed Foster at the Northeast District,
Malone, Biniek, and Task Force Officer William Denford went to
Gainey's apartment at 14 Laurel Path. Hr'g.[12]   Gainey's sister
met the officers in the building hallway. Id.   She told them
that Gainey was working at BWI Airport, and left to pick her up.
Id.   While the officers were waiting inside the apartment,
Jester arrived with another BPD officer. Id.   Gainey returned
to 14 Laurel Path at about 9:15 p.m. Id.   Jester and Biniek
were outside, and asked Gainey's consent to search the
apartment. Id.   Jester described Gainey as surprised but
cooperative, and testified that she was never threatened. Id.[13]
In Jester's presence, Gainey signed a written consent form

---

[10] Foster denied receiving *Miranda* warnings at the Northeast
District and testified that he requested a lawyer. Hr'g.

[11] Foster testified that he told Jester he lived with his mother,
and denied discussing Gainey or living in White Marsh. Hr'g.

[12] Gainey's apartment is part of a complex that contains Units
Two through 28. Hr'g.   Gainey was the apartment leaseholder and
the Baltimore Gas & Electric service at the address was in her
name. Id.

[13] Gainey testified that she initially refused to consent and
only consented after a tall officer wearing glasses said he
would arrest her and everyone else in the home. Hr'g.

5

authorizing a search of the entire apartment. *Id.*[14] On the form, she acknowledged that her consent was freely given and not the product of threats or force. *Id.* During a search of a master bedroom closet,[15] Malone found ammunition, cartridge magazines, loaded magazine holders, and cartridges. *Id.* Gainey never asked the officers to stop the search or leave. *Id.* After the search, Jester gave Gainey a DEA property receipt for the items seized; she signed it. *Id.*

After searching 14 Laurel Path, at about 11:30 p.m., Malone and Biniek interviewed Foster at the DEA's Baltimore District Office. Hr'g. Malone testified that he gave oral *Miranda* warnings and Foster indicated his understanding and willingness to talk. *Id.*[16] Malone described Foster's demeanor as calm and cooperative. *Id.* Foster then provided detailed information about recent cocaine transactions, including a list of customers. *Id.*[17] According to Malone, no threats were made

---

[14] On direct examination, Gainey indicated that she had not read the consent form before signing it. Hr'g. On cross-examination, Gainey indicated that an officer reviewed the form with her, and she read each of the form's provisions. *Id.*

[15] Gainey told the officers that Foster had left his possessions in the closet. Hr'g.

[16] Foster denied having received *Miranda* warnings at the DEA office and testified that he again requested a lawyer. Hr'g. He further testified that agents threatened to incarcerate his family. *Id.*

[17] Foster denied having given this information. Hr'g.

against Foster, nor was Foster denied the opportunity to take a break or drink water. *Id.* The interview concluded at about 1:00 a.m. *Id.*

On December 29, 2011, Foster was charged in a two-count federal complaint with being a felon in possession of a firearm and ammunition and possession with intent to distribute cocaine. ECF No. 1. He was indicted on June 6, 2012. ECF No. 10. On June 15, 2012, Foster was arraigned and pled not guilty. ECF No. 12. On July 3, 2012, Foster moved to suppress custodial statements, ECF No. 13, and tangible and derivative evidence from his arrest, ECF No. 14. On October 25, 2012, the Government timely opposed the motions. ECF No. 23; see ECF No. 22. On October 31, 2012, Foster moved to suppress tangible evidence seized "as a result of" the search of 14 Laurel Path. ECF No. 24.[18] On November 5, 2012, Foster filed a *pro se* omnibus defense motion. ECF No. 25. An evidentiary hearing was held on November 26, 2012.

II. Analysis

   A. Motion to Suppress Custodial Statements (ECF No. 13)

Foster moved to suppress "any and all statements, admissions, and confessions" he allegedly made while in custody.

---

[18] Although the Government filed its opposition before Foster moved to suppress the evidence seized from 14 Laurel Path, the Government anticipated and responded to Foster's argument on this issue. *See* ECF No. 23 at 1-2.

ECF No. 13 at 1.  He argued that "[a]ny such statements" were obtained in violation of his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel. *Id.* ¶¶ 3-4.  Foster further stated that the alleged statements were involuntary.  *Id.* ¶ 5.  The Government countered that the police "complied with all aspects of the Fifth Amendment," including *Miranda v. Arizona*, 384 U.S. 436 (1966).  ECF No. 23 at 8.

1. Fourth Amendment

The Fourth Amendment prohibits unreasonable searches and seizures, and no warrant may issue without probable cause.  U.S. Const. amend. IV.  Under the "fruit of the poisonous tree" doctrine, "a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint."  *Oregon v. Elstad*, 470 U.S. 298, 306 (1985) (internal quotation marks omitted).

Because the arrest and searches were reasonable, *see infra* Parts II.B, C, Foster's subsequent statements were "not fruit of any poisonous tree."  *United States v. Coleman*, 588 F.3d 816, 821 (4th Cir. 2009).

2. Fifth Amendment

To be admissible, a defendant's statement must comply with the Fifth Amendment's right to due process and the privilege against self-incrimination.

a. Due Process

"A statement is involuntary under the Fifth Amendment only if it is 'involuntary' within the meaning of the Due Process Clause." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997), *cert. denied*, 522 U.S. 874 (1997). The test for determining whether a statement is voluntary under the Due Process Clause is "whether [it] was extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Id.* (internal quotation marks omitted). Coercive police activity is a "necessary predicate" to the finding of Due Process Clause involuntariness. *Id.* (internal quotation marks omitted).

The proper inquiry is whether the defendant's "will has been overborne or his capacity for self-determination critically impaired." *Id.* (internal quotation marks omitted). "[C]ourts must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.* at 781 (internal quotation marks omitted).

Foster asserted, without explanation, that his custodial statements were involuntary.  ECF No. 13 ¶ 5.  The Government countered that Foster "simply answered questions and his will was not overborne in anyway [sic]."  ECF No. 23 at 11.  The Government further emphasized that Foster was 35 years old, alert, and had "no apparent difficulty in understanding what was happening or what was being said."  *Id.* at 10.  Foster was neither "injured nor impaired in any way at the time of the interviews and none of the officers present . . . threatened him with violence."  *Id.*  "Nor did the officers threaten him with jail time or specific charges or try to trick Mr. Foster into providing information."  *Id.*  "In all," the Government concluded, "there is no evidence of any coercion, at any time, by the police officers interviewing Mr. Foster."  *Id.*  Foster testified, however, that DEA agents threatened they would lock up his family if he did not talk to them.  Hr'g.

The Court did not find Foster's testimony credible.  Even if true, the testimony did not show that, under the totality of the circumstances, Foster's will was "overborne" or that his capacity for self-determination was "critically impaired."  *Braxton*, 112 F.3d at 780-81.  Thus, his statements were not involuntary.  *See id.*

b. Right Against Self-Incrimination (*Miranda*)

To protect a suspect's right against self-incrimination, police must provide *Miranda* warnings[19] before beginning custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "If . . . he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* at 444-45. Similarly, if he "indicates in any manner that he does not wish to be interrogated, the police may not question him." *Id.* at 445.

However, a defendant may "waive effectuation of the rights conveyed in the [*Miranda*] warnings," provided the waiver is made "voluntarily, knowingly and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotation marks omitted). Courts "engage in the same inquiry when analyzing the voluntari-ness of a *Miranda* waiver as when analyzing the voluntariness of statements under the Due Process Clause." *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002), *cert. denied*, 537 U.S. 963 (2002). Thus, the critical inquiry remains whether the suspect's will was "overborne" or his capacity for self-determination "critically impaired." *Braxton*, 112 F.3d at 780.

---

[19] Police must warn the suspect that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444.

11

Foster asserted that "[a]ny statements, admissions or confessions" were obtained in violation of *Miranda*.  ECF No. 13 ¶ 4.  The Government argued that the relevant statements were made after Foster voluntarily waived his *Miranda* rights.  ECF No. 23 at 8; Hr'g.  Foster testified that he had not received *Miranda* warnings at the Northeast District and had requested a lawyer.  Hr'g.  The Court did not find his testimony credible. Further, as discussed above, Foster did not show that any government agent threatened him, made any promises, or exerted improper influence to extract his statements.  *Supra* Part II.A.2.a.  Thus, his statements did not violate *Miranda*.  *See Cristobal*, 293 F.3d at 140.

3. Sixth Amendment

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.  This right to counsel "attaches only at or after the initiation of adversary judicial proceedings against the defendant."  *United States v. Gouveia*, 467 U.S. 180, 187 (1984).  "The filing of a federal criminal complaint does not commence a formal prosecution."  *United States v. Alvarado*, 440 F.3d 191, 200 (4th Cir. 2006).  Nor does the right to counsel attach immediately after arrest and before arraignment. *Id.*

Foster challenged, on Sixth Amendment grounds, statements allegedly made during custodial interrogation on December 14, 2011. ECF No. 13 ¶¶ 2-3. Foster's arrest that day did not initiate adversary judicial proceedings. *See Alvarado*, 440 F.3d at 200. Thus, his Sixth Amendment right to counsel had not attached at the time of the challenged statements.

B. Motion to Suppress Tangible and Derivative Evidence from the Arrest (ECF No. 14)

Foster argued that the December 14, 2011 traffic stop, his arrest, and the subsequent seizure of evidence from his car were "illegal, without probable cause or reasonable suspicion, were justified by no exigent or other circumstance, and were otherwise in violation of Defendant's rights under the Fourth Amendment." ECF No. 14 ¶ 3. He moved to suppress "any and all evidence derived from searches conducted of Defendant's person, possession, papers, and effects, including physical evidence, admissions, and statements." *Id.* at 1. The Government countered that the police had probable cause to stop and search Foster's car. *See* ECF No. 23 at 5-6.

1. The Stop

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. Fourth Amendment reasonableness inquiries are fact-intensive. *Franklin v. Montgomery County*, No. DKC-05-0489, 2006 WL 2632298, at *13 (D. Md. Sept.

13, 2006).   An officer's subjective motivation for conducting a traffic stop is irrelevant if, objectively, the officer had reasonable suspicion to effect the stop.   *Whren v. United States*, 517 U.S. 806, 812 (1996); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011).   An officer may lawfully make a traffic stop if he observes a violation of traffic laws.   517 U.S. at 817-18; *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) ("Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop."), *cert. denied*, 555 U.S. 1118 (2009).

BPD detectives stopped Foster after observing him change lanes without signaling.   Hr'g.   Mahan testified that, in the span of about four minutes and in heavy traffic, he witnessed Foster's Chrysler repeatedly switch lanes in an unsafe manner, without using a turn signal.   *Id.*[20]   The Court found Mahan's testimony to be credible.   The traffic stop was lawful.

2. The Arrest

"It is well-settled under Fourth Amendment jurisprudence that a police officer may lawfully arrest an individual in a

---

[20] Under Md. Code Ann., Transp. § 21-309(b), "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from that lane or moved from a shoulder or bikeway into a lane until the driver has determined that it is safe to do so."

public place without a warrant if the officer has probable cause to believe that the individual has committed, is committing, or is about to commit a crime." *United States v. Dickey-Bey*, 393 F.3d 449, 453 (4th Cir. 2004). "[P]robable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is committing, or is about to commit an offense." *Id.* (internal quotation marks omitted). Probable cause is judged by analysis of the "totality of the circumstances." *Id.*

Law enforcement personnel were conducting pre-raid surveillance when they observed Foster leaving the residence at 5313 Holder. ECF No. 1 at 2. After legally stopping Foster's car, *see supra* Part II.B.1, and upon approaching the front of the car, one detective smelled marijuana in the car and the other saw--in plain view--a baggie with suspected marijuana in the center console. ECF No. 1 at 2; Hr'g.[21] The totality of the facts and circumstances, within the detectives' knowledge, was sufficient to warrant their belief that Foster had committed,

---

[21] Mahan did not remember whether the windows were up or down, but testified that they were not tinted and that he immediately saw the suspected marijuana. Hr'g. Foster and Gainey testified that the windows were tinted. *Id.* The Court found Mahan's testimony credible.

was committing, or was about to commit a crime.[22]  The arrest was
lawful.

3. The Search of Foster's Person

"[I]n the case of a lawful custodial arrest[,] a full
search of the person is not only an exception to the warrant
requirement of the Fourth Amendment, but is also a 'reasonable'
search under that Amendment."  *United States v. Robinson*, 414
U.S. 218, 235.  Thus, to the extent that Foster has objected to
the search of his person, the search was constitutionally
executed incident to his lawful arrest.  *See id.*; *supra* Part
II.B.2.

4. The Search of Foster's Car

Warrantless searches are presumptively unreasonable.
*Horton v. California*, 496 U.S. 128, 133 (1990).  However, police
may search a car incident to a recent occupant's arrest if "the
arrestee is within reaching distance of the passenger compart-
ment at the time of the search or it is reasonable to believe
the vehicle contains evidence of the offense of arrest."
*Arizona v. Gant*, 556 U.S. 332, 351 (2009).  Under the "automo-
bile exception" to the warrant requirement, police have plenary
power to search a car--and any containers within it--"where they

---

[22] *Dickey-Bey*, 393 F.3d at 453; *see also United States v.
Humphries*, 372 F.3d 653, 659 (4th Cir. 2004) (concluding that a
police officer has probable cause to arrest if the officer
"smells the odor of marijuana in circumstances whe[n] the
officer can localize its source to a person").

have probable cause to believe contraband or evidence is contained."[23]   Probable cause to justify a search requires a "practical, common-sense decision [that], given all the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).   Probable cause does "not require officials to possess an airtight case before taking action," and officers "must be given leeway to draw reasonable conclusions" from available information.   *Taylor v. Farmer*, 13 F.3d 117, 121-22 (4th Cir. 1993).

Characterizing the car search as a search incident to arrest, Foster emphasized that the car "was not within Defendant's reaching distance at the time of the search, and there was no reason to believe that evidence of the crime of arrest might be found in the vehicle."   ECF No. 14 at 2; *see also Gant*, 556 U.S. at 351.   Foster is incorrect.   Upon approaching Foster's car, one detective smelled marijuana coming from the car and another saw--in plain view--a baggie with suspected marijuana in the center console.   ECF No. 1 at 2; Hr'g.   Under these circumstances, the detectives made a "practical, common-sense decision" that contraband or evidence of a crime would

---

[23] *California v. Acevedo*, 500 U.S. 565, 580 (1991); *see also California v. Carney*, 471 U.S. 386, 390-93 (1986); *Carroll v. United States*, 267 U.S. 132, 149 (1925).

likely be found in Foster's Chrysler. *Gates*, 462 U.S. at 238.[24]
That Jester waited to fully search the car in the BPD lot did
not render the search illegal. *See United States v. Gastiaburo*,
16 F.3d 582, 586-87 (4th Cir. 1994), *cert. denied*, 513 U.S. 829
(1994). The car search was lawful.

C. Motion to Suppress Tangible Evidence from 14 Laurel Path
    (ECF No. 24)

Foster moved to suppress all evidence seized from 14 Laurel
Path, on the grounds that the search was warrantless,
unconsented-to, and conducted without probable cause or
exigency. *See generally* ECF No. 24. The Government argued that
Gainey consented to the search. ECF No. 23 at 8. Gainey
testified that she initially refused to consent and only
consented after an officer said that he would arrest her and
everyone else in the home. Hr'g.

The "consent" exception to the warrant requirement "recog-
nizes the validity of searches with the voluntary consent of an
individual possessing authority." *Georgia v. Randolph*, 547 U.S.
103, 109 (2006). That person "might be the householder against
whom evidence is sought, or a fellow occupant who shares common
authority over property, when the suspect is absent." *Id.*
(internal citations omitted). "Common authority" exists when

---

[24] *See also United States v. Ford*, 401 F. App'x 852, 854 (4th
Cir. 2010) (*citing United States v. Scheetz*, 293 F.3d 175, 183–
84 (4th Cir. 2002)).

there is "mutual use of the property by persons generally having joint access or control for most purposes." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). "Determining whether consent is voluntary requires an examination of the totality of the circumstances." *United States v. Stinson*, 468 F. App'x 285, 290 (4th Cir. 2012).

It is undisputed that Gainey signed a consent form authorizing a search of the entire apartment. Hr'g. In dispute was whether that consent was voluntarily given. Jester described Gainey as surprised but cooperative, and testified that she was never threatened. *Id.* Gainey testified that she consented only after a tall officer wearing glasses said he would arrest her and everyone else in the home if she refused to allow the search. *Id.* Gainey's recollection of the exchange was inconsistent--she testified on direct examination that she had not read the consent form, but testified on cross-examination that she had. *Id.* Jester testified that Gainey was never threatened. *Id.* In the signed consent form, Gainey acknowledged that her consent was freely given and not the product of threats or force. *Id.*

As the apartment's leaseholder and primary resident,[25] who shared the master bedroom with Foster, Gainey could consent to a search of that room. *See Randolph*, 547 U.S. at 106, 109;

---

[25] Foster denied that he had ever lived in the apartment. Hr'g.

*Matlock*, 415 U.S. at 171 & n.7.  The Court found that her consent was voluntary.  Thus, the search of 14 Laurel Path was lawful.

   D. *Pro Se* Omnibus Defense Motion (ECF No. 25)

   "Although there is a paucity of Fourth Circuit precedent directly addressing this issue, every Circuit Court of Appeals to have considered the phenomenon of a *pro se* motion filed by a represented party has determined that a court does not have to accept or entertain these motions."  *United States v. White*, No. 7:08-CR-00054, 2010 WL 1462180, at *1 (W. D. Va. Apr. 12, 2010); *see id.* at *1-2 (collecting cases).  Foster's *pro se* motion was denied on the merits.

   1. Motion to Suppress

   Foster moved to suppress "all evidence conducted of Defendant's person, possessions, including admissions and documents."  As discussed above, the searches and seizures in this case were conducted lawfully.  *See generally supra* Part II.A-C.

   2. Discovery

   Foster moved to inspect and/or copy: (1) written reports or statements by each expert consulted by the Government; (2) reports and documents "derived from the polygraphing of any person"; (3) recordings and all "tangible objects" that the Government intends to use at trial; (4) information on whether

20

Foster was "confronted" by identification witnesses in any manner other than a line-up while he was in custody; (5) grand jury testimony; (6) names and assignments of any law enforcement officers who participated "any contraband, sale, purchase, or negotiation having formed any part of the basis" for the charges against him; and (7) numerous "official reports," such as witness statements, laboratory reports, warrants, affidavits, and inventories. ECF No. 25 at 1-3, 5. Foster has never identified discovery that the Government failed to provide to Foster's counsel.

### 3. Maryland Law

Foster alleged, under Maryland Rules 4-252 and 4-253, that the indictment is "defective" and this prosecution is barred by "statute of limitations, immunity, and for former jeopardy." ECF No. 25 at 4. He further demanded that the Government produce, under Md. Code Ann., Cts. & Jud. Proc. § 10-1003, relevant chemical reports. *Id.* Because this is a federal prosecution, Maryland's state rules of criminal procedure and evidence do not apply.

### 4. *Franks* Hearing

Foster stated that he "ha[d] substantial preliminary showing that police reports contain[] a false statement made by the officers either knowingly and intentionally, or with reckless disregard for the truth. ECF No. 25 at 4. He demanded

a "Frank [sic] Hearing." *Id.*; *see Franks v. Delaware*, 438 U.S.
154 (1978). "In the Fourth Circuit, a *Franks* hearing is
warranted if: (1) the defendant makes a substantial preliminary
showing that a false statement knowingly and intentionally, or
with reckless disregard for the truth, was included by the
affiant in a warrant affidavit, and (2) the defendant shows that
the false information was essential to the probable cause
determination." *United States v. Blake*, Criminal No. WMN-06-
0394, Civil No. WMN-11-0080, 2012 WL 78754, at *4 (D. Md. Jan.
10, 2012).

To the extent that Foster challenged the state search
warrant for 5313 Holder, *see* ECF No. 23 at 2, that warrant is
irrelevant to this case; the officers did not rely on it in
stopping, arresting, and searching Foster, or in searching
Foster's car and 14 Laurel Path. No other warrant is involved
in this case. Even if *Franks* applied, Foster did not make a
"substantial preliminary showing" of a false statement made
intentionally or recklessly. *Blake*, 2012 WL 78754, at *4.

5. Bill of Particulars

Foster moved for a bill of particulars. ECF No. 25 at 5.
"A bill of particulars is appropriate when an indictment fails
to provide adequate information to allow a defendant to under-

stand the charges and to avoid unfair surprise."[26]   The

indictment describes the weapon that Foster is accused of

possessing, as well as the date and general location of his

alleged cocaine possession.   ECF No. 10.   This information was

adequate to allow Foster to understand the charges against him

and to avoid unfair surprise.

III. Conclusion

For the reasons stated above, Foster's motions to suppress

and *pro se* omnibus defense motion were denied.

_11/28/12_
Date

William D. Quarles, Jr.
United States District Judge

---

[26] *United States v. Gibson*, 327 F. App'x 391, 392 (4th Cir. 2009)
(per curiam) (*citing United States v. Am. Waste Fibers Co.*, 809
F.2d 1044, 1047 (4th Cir. 1987); *United States v. Jackson*, 757
F.2d 1486, 1491 (4th Cir. 1985); *United States v. Schembari*, 484
F.2d 931, 934-35 (4th Cir. 1973)).